HENNING *v.* McEUEN.

1. EXECUTORS AND ADMINISTRATORS—ASSETS OF ESTATE—MONEY—BURDEN OF PROOF.

   Administratrix of deceased married woman's estate had the burden of proving that at least $8,800 in money the surviving husband found in coffee can in the house belonged to the deceased in a suit for accounting.

2. SAME—BURDEN OF PROOF—OWNERSHIP OF ASSETS.

   Administratrix failed to sustain her burden of proof that any part of at least $8,800 in money found by defendant, the surviving husband, in a coffee can in the house which had been occupied by the deceased and the defendant in suit for accounting, belonged to the deceased.

REFERENCES FOR POINTS IN HEADNOTES

[1-3] Generally as to collection of assets by personal representative of deceased, see 21 Am Jur, Executors and Administrators §§ 221, 222.

[4] 3 Am Jur, Appeal and Error § 815.

3. ACCOUNTING—EVIDENCE OF OWNERSHIP.

Evidence in suit for accounting failed to establish how much or in what proportion a fund of $8,800, found by surviving husband in the house, was contributed by deceased married woman, where it appears that both she and defendant had been steadily employed for over 8 years prior to her death and that deceased had had sole management of the couple's reserve money matters.

4. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW.

The Supreme Court reviews chancery cases *de novo* on the record before it.

5. SAME—CHANCERY CASES—QUESTIONS REVIEWABLE—ADMISSIBILITY OF EVIDENCE—SEPARATE RECORD.

Question as to admissibility of evidence as to plaintiff's disposition of $9,085 fund which had been entrusted to her by her deceased sister is not determined, where testimony was not admitted, no separate record of such testimony was made and leave of court to make such separate record was not requested in suit by plaintiff administratrix against surviving husband for accounting as to fund of at least $8,800 in money which he had found in coffee can in house he and deceased had been occupying (CL 1948, § 617.5).

6. SAME—CHANCERY CASES—SEPARATE RECORD—STATUTES.

One purpose of statute providing for separate record of excluded testimony in chancery cases is to prevent hearing chancery appeals piecemeal (CL 1948, § 617.5).

7. SAME—QUESTIONS REVIEWABLE—AMOUNT FOR WHICH ACCOUNTING IS SOUGHT—OWNERSHIP.

Plaintiff's claim in suit for accounting that fund defendant had found cached in coffee can was $9,040 instead of $8,800 is not considered, where it is determined the entire fund belonged to defendant.

Appeal from Newaygo; Pugsley (Earl C.), J. Submitted October 4, 1951. (Docket No. 34, Calendar No. 45,211.) Decided January 7, 1952.

Bill by Mae Henning, administratrix of the estate of Julia McEuen, deceased, against Lloyd McEuen

.and the Old Stone Bank of Fremont, Michigan, for an accounting. Reversed.

*Searl, White & Block,* for plaintiff.

*J. Donald Murphy,* for defendant McEuen.

BOYLES, J.   Bill in chancery filed by Mae Henning, as administratrix of the estate of Julia McEuen, her deceased sister, against Lloyd McEuen, the surviving husband.   The case involves $8,800 found by the defendant Lloyd McEuen in a coffee can in their home after Julia McEuen's death, which plaintiff claims was the property of her deceased sister.   The Old State Bank of Fremont is also named as defendant because Lloyd McEuen after he found the money deposited it in said bank in his name.   However, the bank has disclaimed any interest in the deposit and agreed to turn it over to the party who prevails in this suit.   Therefore Mae Henning, the administratrix, will be referred to as plaintiff and Lloyd McEuen as defendant.   After taking testimony the circuit judge decreed that half of said $8,800 belonged to Julia McEuen's estate and half to the defendant. The defendant appeals and plaintiff cross-appeals, each claiming the entire sum.

At the time of Julia McEuen's death in November, 1950, she and Lloyd McEuen had been married for over 40 years.   Previous to 1942 they had accumulated a small amount of money which they had invested and lost during the depression and apparently they were broke when they went to live in Fremont, Michigan, in September, 1942.   At that time they both obtained employment at the Gerber Products Company in Fremont, and both remained steadily employed there until Julia McEuen's death in 1950. During that time the defendant each week turned over his pay check to his wife Julia, out of which she

gave him $2 per week allowance and no more.   He
conceded that she was the better manager and money
saver.    Each used a separate pocketbook for their
own daily expenses, Julia took out and kept the mon-
ey for their weekly household expenses in a handbag.
After taking out their living expenses and $2 per
week for the defendant the balance of their earnings
was commingled in a common fund—Julia McEuen
stated that she was "salting it down."    A neighbor
friend who often went uptown with Julia to cash
their checks testified that Julia told her that she kept
her weekly budget expenses in her handbag and that
she had another place for the balance of their pay
checks "where we call it 'salting it down'   *    *    *
once I put it away I never take it out for anything."

Shortly after Julia's death the defendant found
$8,800 in $5, $10 and $20 bills in a coffee can in the
clothes closet of their apartment, and deposited it
in the bank.   This is the money here in dispute and,
except for 10 shares of Gerber stock, the value of
which is not shown by the record, represents all of
the defendant's assets at the time of his wife's death.

Plaintiff Mae Henning testified that for a period
during the depression her sister Julia had been given
money by their father totalling about $1,800 which
Julia's husband did not know about.   A witness tes-
tified that in 1939 Julia McEuen received $1,276 from
a judgment for damages she had sustained in an
automobile accident.    There was some testimony
that in 1939 Julia McEuen had about $4,000 in cash,
and that in 1946 Julia McEuen had left $6,000 with
her sister Mae Henning for safekeeping, which was
left in a deposit box in a Grand Rapids bank.   Mae
Henning testified that in 1950 Julia McEuen had left
$9,085 in $10 and $20 bills with her during the months
of July, August and September while the McEuens
were taking some short trips.   Counsel for plaintiff
attempted to show by Mae Henning that she had

turned this money over to Julia McEuen shortly before the latter's death. However, the court excluded such testimony on the ground that Mae Henning and the defendant were both heirs-at-law and as such were interested in the estate of Julia McEuen and that Mae Henning, being an interested party, could not so testify, because such testimony would be equally within the knowledge of the deceased Julia McEuen.* As to that, the plaintiff bases her cross appeal on the claim that the court was in error in excluding such testimony.

The amount of the net take-home pay earned each by Julia McEuen and her husband while working at Gerber's is not in dispute. Julia McEuen earned $11,804.05 and Lloyd McEuen earned $19,074.69 as net wages, the actual take-home pay of each of them. Their living expenses while they were working for Gerber averaged about $110 per month. Deducting their living expenses from Lloyd McEuen's take-home earnings from September 1, 1942, to the time of Julia's death in November, 1950, and also deducting his allowance of $2 per week, would leave approximately the amount of money "salted down" which he found in the coffee can in the closet of their home. Furthermore, the amount of money which Mae Henning claims to have had belonging to Julia McEuen in the summer of 1950, but as to which she was not allowed to testify that she had returned it to her sister Julia before her death, would be approximately the $9,040 which Mae Henning claims was the amount found by the defendant in the coffee can.

The burden of proof rested on the plaintiff to prove that the money the defendant found in the coffee can belonged to Julia McEuen. Plaintiff has not sustained such burden of proof. While Mae Henning testified that Julia McEuen during the

---

* See CL 1948, § 617.65 (Stat Ann § 27.914).—REPORTER.

summer of 1950 had left money in her possession,
there is no proof as to what became of it. Whether
the plaintiff still has it on deposit in a bank or in a
safety deposit box, or, if not, what has become of it,
is left to conjecture. The trial court concluded:

"He (the defendant) had nothing to say in the
management of the house so far as the finances were
concerned. She kept the money. What became of
it (the mingled fund) we do not know, only by con-
jecture, at least only in part.

"We do know when she died her husband found
$8,800 in a can. It is the conclusion of this court and
the only approach to equity, as I see it, that this was
the joint fund of the parties to this suit. It is a case,
in which, in my opinion, their earnings and their sav-
ings had been pooled together for the joint benefit
of each."

The defendant claims that the court erred in de-
creeing him only half of that amount. We are unable
to agree with the conclusion that half of the $8,800
belongs to the estate of Julia McEuen. There is no
proof to establish how much or what proportion of
that $8,800 was contributed by Julia McEuen. Ei-
ther the entire fund in the coffee can was contributed
by her and belongs to the estate, or the entire amount
belongs to the defendant. With that conclusion, at
least, counsel for both parties are in accord—each
claims the entire fund. There is no question but that
Mae Henning had money in her possession which be-
longed to her sister. A disinterested witness testi-
fied that on September 15, 1950, about 2 months be-
fore her death, Julia McEuen told her that she did
not put her money in a bank, that she did not trust
banks, and that she sent her money to her sister in
Grand Rapids (the plaintiff). Another witness tes-
tified that Julia McEuen told her that she (Julia) at

one time had $6,000 in a deposit box in Grand Rapids, and that she sent her money to her sister.

We hear chancery cases *de novo* and our conclusions are based on the record before us. We have no way of knowing the extent to which the trial court may have been influenced by the advantage of seeing and hearing the witnesses. It seems unlikely that plaintiff would have returned $9,085 to her sister Julia shortly before Julia's death after Julia for years had followed the practice of entrusting *her* money to the care of the plaintiff. Furthermore, it is not likely that Julia would entrust all of their combined earnings or those of Lloyd McEuen to her sister, contrary to her custom in handling their earnings of "salting it down." And lastly, if the entire $8,800 belongs to the estate, Lloyd McEuen would have nothing for his earnings of over $19,000 from working at Gerber's approximately 8 years except 10 shares of Gerber stock, the value of which is not shown by the record.

The record does not support the conclusion that any part of the money in the coffee can belongs to the estate. As to that, the plaintiff's burden of proof fails. As between plaintiff, as administratrix, and the defendant, the fund in the bank is the property of the defendant.

Plaintiff-cross appellant claims that the court erred in denying her the right to testify that she had turned over $9,085 to her sister shortly before her sister's death. While the court permitted plaintiff to testify that she had that amount of money belonging to her sister Julia in her possession during the months of July, August and September before her sister's death in November, it is true that the record is barren of any proof as to what has become of it. Counsel for plaintiff-cross appellant now asks of this Court that "plaintiff's testimony upon the facts as she knew them concerning the money of Julia Mc-

Euen should be taken by deposition or reference for the further consideration of this Court." Counsel concedes that no separate record was taken or requested of the court to have such testimony in the record, but "respectfully asks that her testimony be taken under the statute and returned to this Court." If the excluded testimony were before us in a separate record the question would then be for our determination as to whether that testimony was admissible, under the statute which bars testimony equally within the knowledge of the deceased, and the precise question would be whether the fact that Mae Henning and the defendant Lloyd McEuen were both heirs-at-law of the deceased Julia McEuen would bar Mae Henning from giving such testimony. In the absence of such testimony in the record, or in a separate record, the question of its admissibility is not passed upon. Under these circumstances, the Court does not consider its admissibility or its effect if Mae Henning would have, or had, so testified.

"To preserve the question of the admissibility of excluded testimony in chancery cases for proper review, correct practice requires that a special record of the offered testimony should be made. *Michiana Shores Estates, Inc.,* v. *Robbins,* 290 Mich 384. In *Counihan* v. *Hayes,* 246 Mich 390, we said:

" 'Counsel should have taken such testimony under the provisions of CL 1915, § 12493,* or at least have asked the court for leave to do so. It was not sufficient to state upon the record what the testimony would show and then rely upon an exception to its exclusion. Had the practice been followed we would now have such testimony, and, if material and competent, could use it. One purpose of the statute is to prevent hearing chancery appeals piecemeal, and we decline to reverse the decree for the reason men-

---

* CL 1948, § 617.5 (Stat Ann § 27.853).—REPORTER.

tioned, and to remand the case to take further evidence.'

"In the case at bar, there is no showing on the record of what the witnesses would have said had they been permitted to testify. The excluded testimony was not taken under the provisions of the statute, nor was the court asked for leave to do so. Under these circumstances, this Court will not exercise its discretion to have the testimony taken and sent here." *Kerns* v. *Kerns,* 303 Mich 23.

To the same effect, see *Gross* v. *Housner,* 322 Mich 448.

In view of our conclusion that the entire fund belongs to the defendant, we need not consider plaintiff's claim that it amounted to $9,040 instead of $8,-800. The decree is set aside and an order may be entered dismissing the bill of complaint, with costs to appellant.

NORTH, C. J., and CARR, BUSHNELL, SHARPE, and REID, JJ., concurred with BOYLES, J.

DETHMERS, J., concurred in the result.

BUTZEL, J., did not sit.